## In re Vytautas VEBELIUNAS, Debtor.

### Roy Babitt, Trustee, Plaintiff,

### v.

### Vytautas Vebeliunas, Defendant.

### Roy Babitt, Trustee, Plaintiff,

### v.

### Vytautas Vebeliunas, individually and as trustee of a Revocable, Vart Trust, Vanda Vebeliunas, individually and as trustee of an Irrevocable Vart Trust, Daniel Lipman, Melissa Lipman, Chase Manhattan Bank, and Citibank, N.A., Defendants.

Bankruptcy No. 98 B 45466.
Adversary Nos. 99–2379, 00–2297.

United States Bankruptcy Court,
S.D. New York.

April 21, 2000.

Bauner Baron Rosenweig & Klein, LLP, by Jon D. Kaplon, Son K. Le, New York City, for Roy Babitt, Plaintiff–Trustee.

Feder, Goldstein, Tannenbaum, D'Errico & Arnedos, LLP, by Frank N. D'Errico, Carle Place, NY, for Defendant Vanda Vebeliunas, individually and as trustee of the Irrevocable Vart Trust.

Vytautas Vebeliunas, individually and as trustee of the Revocable Vart Trust, Richmond Hill, Defendant, pro se.

Dollinger Gonski & Grossman, by Matthew Dollinger, Leslie Foodim, Carle Place, NY, for Chase Manhattan Bank.

Moses & Singer, by Alan Gamza, Jerome Lasky, New York, NY, for Citibank, N.A.

Steinberg & Associates, by Herbert Noel Steinberg, Kew Gardens, NY, for Daniel and Melissa Lipman.

### *MEMORANDUM OF DECISION*

RICHARD L. BOHANON, Bankruptcy Judge.

This memorandum, following a trial, is made pursuant to Rule 52 of the Federal Rules of Civil Procedure which is adopted in bankruptcy proceedings by Rule 7052 of the Federal Rules of Bankruptcy Procedure. Two separate adversary proceedings have been consolidated for trial.

When the plaintiff rested his case Vanda Vebeliunas moved for judgment as a matter of law under Rule 52(c) Fed.R.Civ.P. The court declined to rule on this motion until the close of all the evidence. She rested her case and the parties presented

their closing arguments. Accordingly, the motion was deemed moot and the case taken under submission. Post trial briefs have now been received and considered.

One of the adversary proceedings concerns ownership of a valuable residential estate located in Lattingtown, New York (the "Lattingtown Estate") and an adjacent estate property ("Lot 384"). The trustee-plaintiff seeks to have these properties turned over to the estate pursuant to 11 U.S.C. § 542, arguing that the debtor is an alter ego of the trust which holds record title to them and, therefore, it should be disregarded.

The second proceeding is an objection by the plaintiff-trustee to the discharge of the debtor, contending that he knowingly made fraudulent, false oaths and withheld recorded information, under 11 U.S.C. § 727(a). In addition the trustee seeks to except debts to Chase Manhattan Bank and Citibank, N.A. from any discharge granted to the debtor, under 11 U.S.C. § 523(a).

The debtor does not schedule the Lattingtown Estate nor Lot 384 as assets in connection with the bankruptcy petition. He denies that he ever owned either of these properties. The debtor's wife, Vanda Vebeliunas ("Vanda"), argues that the properties are owned by an Irrevocable Vart[1] Trust of which she is sole trustee and the debtor and family members are beneficiaries. The defendants Lipman own and reside on property adjoining the Lattingtown Estate and are named due to an agreement their predecessor in title made with the debtor concerning boundaries. They have not actively participated in the proceedings and did not attend the trial.

Chase Manhattan Bank ("Chase") is named for it claims a first lien on the Lattingtown Estate due to a mortgage ex-ecuted by the debtor. Likewise, Citibank, N.A. ("Citibank") claims a junior lien as holder of a second mortgage also executed by the debtor. These banks participated in the trial.

## JURISDICTION AND VENUE

This court has jurisdiction pursuant to 28 U.S.C. § 1334(a) and the adversary proceedings are core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (E), (J) and (O).

Venue is proper pursuant to 28 U.S.C. § 1409(a).

## FINDINGS OF FACT

Vytautas Vebeliunas is the debtor and he, with his wife, Vanda, resides at the Lattingtown Estate. His bankruptcy petition was filed under chapter 11 of the Bankruptcy Code on May 21, 1998 in the United States Bankruptcy Court for the Eastern District of New York. Subsequently, it was transferred to this court because it was deemed related to another case already pending here. In November, 1998 the case was converted to one under chapter 7 and Roy Babitt was appointed trustee.

The Lattingtown Estate consists of about 17 acres of land containing a large main house, a cottage, a swimming pool, a pool house, a tennis court and a five car garage. Testimony indicates the estate has a value of $4,000,000 to $5,000,000. Lot 384 abuts the Lattingtown Estate and contains about five acres upon which there is a nine-room house. Evidence shows that Lot 384 may have a value in excess of $1,000,000. The properties are located on the north shore of Long Island in the vicinity of the Town of Oyster Bay in an area of exclusive homes and estates.

Since 1977, except for two years during which he was in federal prison, the debtor, Vanda and other family members have lived on the Lattingtown Estate.

1. The word "Vart" is a sobriquet made from the names of Vebeliunas family members.

The debtor has many years experience as a public accountant and has been engaged in numerous business ventures and projects during a lengthy career.[2] Many of his ventures were related to real estate development in the New York City vicinity and in Florida. He served a sentence in federal penitentiary for bank fraud, misapplication of credit union funds, criminal conflicts of interest, filing false loan applications and related charges. The sentence was served following conviction and appeal.[3]

On June 12, 1977 an entity known as North Shore Partnership ("NSP") was created. While the debtor was not a partner he caused its formation. The partners were Vanda, other family members and business associates of the debtor.

On July 12, 1977 the Lattingtown Estate, which then contained approximately 65 acres, was acquired by Litas Investing Co., Inc. ("Litas"). It also was one of the entities, concerning which the debtor was an insider, used for real estate and other business ventures. Shortly after Litas acquired the property the debtor and his family began residing at the estate.

On July 15, 1977 NSP and Litas entered into an agreement regarding the Lattingtown Estate. Their arrangement provided generally that NSP would develop and subdivide the Lattingtown Estate into lots for sale. Title remained in Litas but, upon satisfaction of terms of the arrangement, it would transfer or "release" specific lots to either Litas or the ultimate buyer.

The debtor caused creation of the "Vart Trust, a revocable, living trust" ("RVT") which is dated March 4, 1983. He is the sole trustee and the beneficiaries are Vanda and certain children. The trust was to be the owner of a life insurance policy on the debtor's life and was to hold "[m]y residence in Locust Valley, New York..."[4] Neither were ever transferred to the RVT.

On February 16, 1985 Vanda caused to be created the "Vart Trust", an irrevocable trust ("IVT"). Under its terms she is the sole trustee, and the debtor is a beneficiary "eligible to 20% of all of the distributions from the Corpus of the Trust."[5] Other beneficiaries are the parties' children. The stated purpose of the IVT was to hold title to the Lattingtown Estate.

On February 25, 1985 Litas conveyed the Lattingtown Estate, now containing about 17 acres, to the IVT and this deed was recorded with the County Clerk of Nassau County, New York.[6] Neither trust instrument was ever placed in the public records.

---

2. Reported decisions also indicate that the debtor is not unfamiliar with litigation in both state and federal courts. *See eg. Litas Investing Co., Inc. v. Vebeliunas*, 148 A.D.2d 680, 539 N.Y.S.2d 429 (N.Y.App.Div.1989); *Vebeliunas v. Am. Nat'l Fire Ins. Co.*, 156 A.D.2d 555, 549 N.Y.S.2d 60 (N.Y.App.Div.1989); *Shapiro v. Vanda Rest Corp. (In re Litas Int'l, Inc.)*, 1996 WL 617776, (Bankr.S.D.N.Y.) *aff'd* 1996 WL 671027 (S.D.N.Y.); *United States v. Sea Winds of Marco, Inc.*, 893 F.Supp. 1051 (M.D.Fla.1995); *Peter A. Dankin, P.C. v. N. Shore Partnership*, 255 A.D.2d 207, 680 N.Y.S.2d 91 (N.Y.App. Div. 1st. Dep't 1998); *Zards v. Comm'r*, 1995 WL 605433, 70 T.C.M. (CHH) 1023, T.C.M. (RIA) 95497; *In re Vebeliunas*, 231 B.R. 181 (Bankr.S.D.N.Y.1999), *appeal dismissed*, 246 B.R. 172 (S.D.N.Y. 2000).

3. *See United States v. Vebeliunas*, 76 F.3d 1283 (2nd Cir.1996), *cert. denied*, 519 U.S. 950, 117 S.Ct. 362, 136 L.Ed.2d 253 (1996), *and denial of post-conviction relief aff'd. in part, vacated in part*, 164 F.3d 620 (2nd Cir. 1998).

4. Evidence indicates this property is the Lattingtown Estate.

5. On the schedules filed with his bankruptcy petition debtor lists as an asset "20% interest in Vart Trust."

6. The trustee argues that the consideration paid for this transfer was inadequate but his evidence of the amount paid is conflicting and unclear. In any event, it does not show by a preponderance that the consideration was inadequate, and there is no question but that

The debtor and his family continued to live in the Lattingtown Estate and treated it as their own property.

Additionally, the IVT did not follow the usual "formalities" expected of trusts. In this connection the trustee-plaintiff established at trial that:

1. From its creation, until 1997, the IVT never filed a tax return;

2. From its creation, until 1997, the IVT never opened a bank account;

3. The debtor and Vanda received and kept rents from the Lattingtown Estate;

4. After Vanda's son, Aras Vebeliunas, the named successor trustee of the IVT, became involved he also routinely retained rent monies to which the IVT was entitled;

5. In April, 1984 the debtor granted an easement over the Lattingtown Estate to the local utility company;

6. Neither the debtor, Vanda nor any family member have ever paid any rent to the IVT for their use and occupancy of the Lattingtown Estate;

7. The debtor and Vanda have taken deductions from their personal income tax for real estate taxes and interest relating to the Lattingtown Estate;

8. The IVT was not a named insured in connection with insurance policies on the Lattingtown Estate;

9. Virtually all of the expenses of the IVT were paid by the debtor, even though he was only supposed to fund trust liabilities in excess of profits, according to the trust instrument;

10. Other than the trust instrument and tax returns for 1997 and 1998 Vanda, as trustee of the IVT, has not turned over, produced or identified any books or records concerning the IVT;

record title has been held by the IVT since February, 1985. Vanda contends that the consideration came from inherited funds

11. In February, 1987, in connection with a loan application, debtor represented to Chase that the RVT, over which he had complete control, was the owner of the Lattingtown Estate;

12. In May, 1987 debtor, as sole trustee of a "Vart Trust", purported to convey the Lattingtown Estate to himself;

13. In May and September, 1987 debtor granted separate mortgages to Chase and Citibank to secure notes totaling $1,700,000 with the Lattingtown Estate;

14. In August, 1987, in connection with the loan application to Citibank, debtor signed a sworn affidavit stating that the RVT owned the Lattingtown Estate and there was no IVT;

15. On February 3, 1998 debtor purportedly transferred the Lattingtown Estate back to the "Vart Trust";

16. In 1989 the debtor, alone, signed an easement agreement with the neighbors to the Lattingtown Estate;

17. In 1990 debtor, on behalf of the RVT, purported to grant a mortgage on the Lattingtown Estate to a business associate, Mortimer Levitt, which was made specifically subordinate to mortgages in favor of Chase and Citibank;

18. In 1992 debtor signed an appearance bond for the United States District Court in the amount of $2,000,000 and pledged the Lattingtown Estate as if it were his own; and

19. In 1993 the debtor signed an affidavit of confession of judgment in favor of the United States in which he agreed to forfeit the Lattingtown Estate, declaring it to be a personal asset, if he did not appear for his criminal trial.

## THE NOTES AND MORTGAGES

The central issue at the trial concerned loans made by the debtor with Chase and

which appreciated through investment in Litas.

Citibank and the events surrounding these transactions merit further explanation.

The debtor's fortunes were largely dependent on real estate values, and beginning in the mid 1980's the value of the holdings of his various entities began to decline steeply. Creditors and affiliates of the debtor were demanding payments and he was in critical need of cash.

In January, 1987 debtor applied to Chase for a $2,000,000 loan to be secured by a first mortgage on the Lattingtown Estate. The bank then commenced the normal "due diligence" lending procedures. In February it preliminarily agreed to loan debtor $1,000,000 secured by a first mortgage on the Lattingtown Estate. Chase became aware from its title report that the property was held by the IVT and, as a condition of the loan, it required that title to the collateral be held in debtor's name only at the time of loan closing.

On April 20, 1987 the bank delivered its formal loan commitment agreeing to loan the $1,000,000 on the terms outlined. Then, on May 13, 1987 the debtor executed a deed from "VART TRUST BY: Vytautas Vebeliunas" to himself seeking to satisfy the bank's condition that he hold title to the Lattingtown Estate.

The loan closing also occurred on May 13, 1987 and debtor executed a mortgage to Chase to secure the loan and in it he affirms that "(A) I lawfully own the Property [Lattingtown Estate] and (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property...." He also executed and delivered an "Owner's Estoppel Certificate" stating that "said mortgage is a valid and first lien on the premises." In addition he swore to and delivered a "Mortgage Affidavit" stating that "I know of no facts or reasons why my title or possession might be disputed or questioned." Upon receipt of these and the other loan docu-

ments, Chase delivered debtor its check for $1,000,000. The debtor knew that the statements he made about ownership of the Lattingtown estate were false, fraudulent and misrepresented the truth of who held title.

Chase relied, reasonably, upon a certificate of title issued to it by First American Title Insurance Company of New York stating that, as of the closing date, title to the mortgaged property was in Vytautas Vebeliunas.

Earlier, on April 16, 1987, debtor had applied to Citibank for a loan of $1,500,000 also to be secured by the estate. In this application he stated that title was held by "V.A.R.T. Trust."

In the summer of 1987, the debtor resumed his application for the Citibank loan. It agreed to loan him $700,000 secured by a second mortgage on the Lattingtown Estate. Citibank's title insurer, Ticor Title Guarantee Company, requested a copy of the trust which held title to the estate, and on August 26, 1987, debtor's lawyer sent a copy of the RVT trust agreement. Ticor noted, however, that the February 1985 deed from Litas was to "VART TRUST, an Irrevocable Trust" and the trust instrument which had been furnished to it was specifically a revocable trust. To remedy this obstacle the debtor then, on August 31, 1987, signed and delivered an affidavit which states:

1. That I am the Trustee of a certain revocable trust called Vart Trust which was created on March 4, 1983.

2. That Vart Trust is a revocable trust and that deed entered between Litas Investing Co., Inc. and Vart Trust should have had the word "rev-cable" instead of "irrevocable" The word "irrevocable" was entered in error.

3. That the copy herewith attached is the only trust in force and effect and there is no irrevocable trust.

Attached to this affidavit was a copy of the RVT. This statement was patently a false representation and was fraudulent.

Based, however, on this false affidavit and the earlier deed from the RVT to debtor, Ticor issued its policy to Citibank stating that the mortgage covering the Lattingtown Estate executed by the debtor was valid. Accordingly, on September 1, 1987 the Citibank loan closed and the debtor received the $700,000.

On February 3, 1988 the debtor, by deed, purportedly transferred the Lattingtown Estate back to "VART TRUST".

In 1994 the loans were in default and debtor attempted to refinance the Chase loan. To that end he offered guarantees of Vanda and his sons to Chase, attempting to induce it to renegotiate the loan terms. When these efforts failed debtor then attempted, unsuccessfully, to sell the estate.

In January, 1995 Chase initiated a proceeding against the debtor and others seeking to foreclose its lien on the Lattingtown Estate. Only in response to this complaint did the debtor assert to Chase the existence of the IVT, ten years after its creation. In his answer debtor alleged that he did not own the estate; that it was actually owned by the IVT; and that he had merely pledged his 20% beneficial interest in the IVT. This statement is, obviously, directly contrary to the statements he made to the banks to induce them to make the loans in the first place, is plainly a fabrication and is not credible.

Plaintiff, however, has not shown by a preponderance of the evidence that Vanda knew of the Chase and Citibank loans until Chase commenced foreclosure and I find that she did not have this knowledge until about the time the foreclosure suit was served.[7] In 1997 the IVT acquired Lot 384 from the North Shore Partnership.[8]

The evidence shows that throughout this entire period Vanda was a traditional housewife and mother taking care of the home and rearing children while her husband conducted the family's financial and business affairs. She is a college graduate and did have some limited employment as a travel agent and also occasionally worked with some of the family enterprises. However, there is no evidence that she possesses any degree of legal, business or financial sophistication or that she ever understood or knew the duties and obligations of a trustee, or even knew enough to inquire of these matters.

## CONCLUSIONS OF LAW

Based on these facts the plaintiff-trustee seeks to have the debtor declared the alter ego of the IVT, and have its assets, the Lattingtown Estate and Lot 384, turned over to the bankruptcy estate.

The trustee-plaintiff has the burden of proof in a turnover proceeding brought pursuant to 11 U.S.C. § 542. *See eg. Williams v. Am. Bank of Mid–Cities, N.A. (In re Williams)*, 61 B.R. 567 (Bankr. N.D.Tex.1986). The question is, what is

7. In January, 1993 debtor submitted to Chase a "Financial Analysis" in connection with his efforts to modify the terms of the loan. This document bears debtor's signature above the line for "Borrower" and also a signature above the line for "Co–Borrower." This writing is illegible on the document in evidence and Vanda denies it is her signature. She testified that if it is her name then debtor or someone else signed it without her knowledge and there is no crédible evidence to refute this statement. *See* Trustee's Exhibit 68, p. 144.

In any event, evidence of her conduct after the dates of the loan closings, while it was received in evidence over her objection, is of doubtful relevance.

8. The trustee also argues the consideration for this transaction is inadequate. As in the case of the Lattingtown Estate, however, a preponderance of the evidence does not establish this contention as a matter of fact.

his burden of proof and has he met it?[9]

Vanda's argument, in her capacity as trustee of the IVT, is that she did not know of the wrongdoings of her husband, did not participate in his fraudulent activities and should not be made to suffer loss of the properties because of his misconduct. The plaintiff's argument is that debtor is the alter ego of the IVT and that, *ipso facto*, its assets now belong to the bankruptcy estate.

The plaintiff, and the banks, make a second argument that Vanda, as trustee of the IVT, should be estopped from claiming ownership of the Lattingtown Estate.

*The Alter Ego Theory*

■ The parties have assumed from the outset that the alter ego theory[10] of corporate law is applicable in this case.[11] However, this Court has been unable to find any reported decisions on point which support extension of the alter ego theory, a creature of corporate law, to the law of trusts,[12] and for the reasons explained below declines to extend the theory to trusts.

■ A trust, as opposed to a corporation or other business organization, is not capable of having an alter ego. Rather, a trust is fundamentally a relationship. Indeed, at least one author has noted:

> It will be noticed in the first place that we have said that a trust is a *relationship* having certain characteristics. Legal writers and courts have sometimes defined a trust as a certain kind of duty or obligation. Such a definition is too narrow. . . . The trust is the whole juridical device: the legal relationship between the parties with respect to the property that is its subject matter, including not merely the duties that the trustee owes to the beneficiary and to the rest of the world, but also the rights, privileges, powers, and immunities that the beneficiary has against the trustee and against the rest of the world.

I WILLIAM FRANKLIN FRATCHER, SCOTT ON TRUSTS § 2.4 (4th ed.1987). *See also, Coleman v. Golkin, Bomback & Co., Inc.,* 562 F.2d 166, 168–69 (2nd Cir.1977)(citing with approval RESTATEMENT (SECOND) OF TRUSTS § 2 (1959) which defines a trust as a relationship). Other definitions of a trust liken it to a contract, a property right, or a legal obligation. *See generally,* John H. Langbein, *The Contractarian Basis of the*

---

**9.** The standard of proof is preponderance of the evidence. *See Hunter v. Patton (In re Patton),* 200 B.R. 172, 174–175 (Bankr. N.D.Ohio 1996)(relying on *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).

**10.** The alter ego theory is known by many labels including: "disregarding the corporate entity," "piercing the corporate veil," "instrumentality theory," and the "alter ego theory." *See,* Note, *Piercing the Corporate Law Veil: the Alter Ego Doctrine Under Federal Common Law,* 95 HARV. L. REV. 853, 853 n. 1 (1982).

**11.** Although standing to bring this action was not raised by any of the parties, it should be noted that some controversy exists today among bankruptcy courts about whether a bankruptcy trustee may bring an alter ego suit on behalf of the bankruptcy estate. *See generally,* John D. Wilmore, *The Bankruptcy Trustee: Can an Alter Ego Sue in Alter Ego?,* 20 CAL. BANKR. J. 155 (1992)(discussing the ongoing debate and opposing rationales for permitting or prohibiting trustees from bringing alter ego suits).

**12.** Those cases which do use a similar theory to disregard a trust relationship are easily distinguishable from the case at bar. They involve a limited arena of taxpayer liability law where taxpayers attempted to use a trust transaction to avoid their personal tax liability. *See e.g., Loving Saviour Church v. United States,* 728 F.2d 1085 (8th Cir.1984); *F.P.P. Enterprises v. United States,* 830 F.2d 114 (8th Cir.1987); *William L. Comer Family Equity Trust v. United States,* 732 F.Supp. 755 (E.D.Mich.1990), *aff'd sub nom., William L. Comer Family Equity Trust v. Comm'r,* 966 F.2d 1455, 1992 WL 139645 (6th Cir.1992); *United States v. Letscher,* 83 F.Supp.2d 367 (S.D.N.Y.1999); *United States v. Kattar,* 81 F.Supp.2d 262 (D.N.H.1999).

*Law of Trusts*, 105 YALE L.J. 625 (1995)(describing a trust as a contract); *Keplinger v. Keplinger*, 185 Ind. 81, 113 N.E. 292, 293 (1916)("A trust may be defined as a *property right* held by one party for the use of another.")(emphasis added); Hart, *What is a Trust?*, 15 LAW QUART. REV. 294, 301 (1899)(" A trust is an *obligation* imposed, either expressly or by implication of law ... ")(emphasis added).

 It follows that a trust, being a relationship, cannot have an alter ego, which would be akin to saying that someone is the "alter ego" of a contract. Since a trust is not an entity in the technical sense, it has no independent existence apart from the settlor, trustee and beneficiary.[13] On the other hand, corporations do have an existence independent from their shareholders. For instance, a corporation may sue on its own behalf whereas a trust cannot. *See J.D.L. Corp. v. Bruckman*, 171 Misc. 3, 11 N.Y.S.2d 741, 744 (N.Y.Sup.Ct.1939). Indeed, only the trustee can bring suit on behalf of a trust. *See Fiduciary Co., Ltd. v. Micro–Therapeutics, Inc.*, 83 A.D.2d 814, 442 N.Y.S.2d 58, 59 (N.Y.App.Div.1981).

 The alter ego theory and doctrine of "piercing the corporate veil" originated strictly as devices of corporate law because a corporation has limited liability. They were developed in corporate law as equitable remedies to prevent injustice when shareholders seek to use the corporation to escape their personal liability.[14] In other words, the theory developed to prevent one entity, the shareholder, from using another entity, the corporation, as a

shield against liability that is truly an obligation of the shareholder. *See generally*, A. Schipani, *Infiltration of the Enterprise Theory into Environmental Jurisprudence*, 22 J. CORP. L. 599 (1997)(providing an excellent discussion on the history of the limited liability principle and development of the doctrine of "piercing the corporate veil"). Thus, the alter ego theory and the doctrine of "piercing the corporate veil" apply only in cases where there are entities involved which have their own distinct existence. A trust, however, as explained above is simply a relationship.

A relationship does not exist aside from its participants. A corporation on the other hand does exist separate from its shareholders. It is this separate existence that permits a shareholder to be an alter ego of a corporation. Since a trust has no separate existence outside of its participants, it is not capable of having an alter ego. Thus, in the present case, the alter ego theory is inapplicable.

Having declined to apply the alter ego theory in this matter, the remaining argument left to consider is equitable estoppel.

*Equitable Estoppel*

 The trustee argues that the IVT should be estopped from asserting ownership of the Lattingtown Estate for Vanda learned of the loans sometime after they were made and remained silent. As noted earlier, evidence of her knowledge of facts after the loans were made is of doubtful relevance. In any event, I have already found from the most credible evidence that she did not know of the loans until at or near the time the banks sued to foreclose.

---

**13.** This use of the word entity is not meant to refer to the definition used in the Bankruptcy Code. *See* 11 U.S.C. § 101(15). Rather, the term is used here in its ordinary, everyday meaning of "self-contained existence.". MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 387 (10th ed.1995).

**14.** Many courts have extended the alter ego theory to business entities other than corporations. *See generally*, David L. Cohen, *Theories*

*of the Corporation and the Limited Liability Company: How Should Courts and Legislatures Articulate Rules for Piercing the Veil. Fiduciary Responsibility and Securities Regulation for the Limited Liability Company?*, 51 OKLA L. REV. 427 (1998)(discussing extension of the alter ego theory and doctrine of piercing the corporate veil).

■ The plaintiff's argument on equitable estoppel must fail because the essential elements are not met. The plaintiff relies on *Ellison Assoc. v. Eastwood Management Corp. (In re Ellison Associates)*, 13 B.R. 661 (Bankr.S.D.N.Y.1981), *aff'd*, 63 B.R. 756 (S.D.N.Y.1983). In that case Judge Lifland concluded that the debtor was estopped from asserting ownership in certain property due to its false representations and silence. The court succinctly lists the elements of estoppel by silence or inaction, under New York law, as "(1) a duty to speak; (2) an opportunity to speak; and, (3) injury to another party as a result of the failure to speak." *Ellison*, 13 B.R. at 675–676.

■ The duty to speak may arise where the facts establish (1) a fiduciary or confidential relationship exists, or (2) one party has superior knowledge, or (3) one party will receive unjust enrichment. *See In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503, 525 (Bankr.E.D.N.Y.1994). While Vanda did have a fiduciary relationship with the IVT, she did not have one with the banks. In fact, there is no evidence in this record that Vanda had knowledge of the banks' dealings with her husband until they instituted foreclosure proceedings. Superior knowledge by one party in a transaction may also trigger a duty to speak. While New York courts have continued to broaden situations where superior knowledge applies, "courts have not extended such a duty to one who is not a party to the transaction." *Id.* at 526. Just as in *Windsor Plumbing* where the debtors had no relationship with the creditor bringing the action, here the plaintiff has been unable to prove that Vanda, either individually or as trustee for the IVT, had a part in the transactions between her husband and the banks. Having no superior knowledge, she had no duty to speak. Unjust enrichment is another ground for finding a duty to speak. However, it is inapplicable here because

the requisite privity of parties is not present for there was no relationship between Vanda and the banks. *See id.* at 527. Furthermore, there is no evidence showing that Vanda was enriched by the funds the banks lent to her husband.

Here, Vanda had no duty to speak to the banks for the proof fails to show that she had any knowledge of the debtor's misconduct regarding them; she did not have an opportunity to speak for the same reason; and the banks were injured due to debtor's failure to speak the truth, not Vanda's failure. *See also Viele v. Judson*, 82 N.Y. 32, 1880 WL 12533 (N.Y.1880) (holding that for silence to operate as a fraud the party maintaining silence must know that someone is relying on that silence).

In its memorandum Citibank relies on *In re Lockwood's Estate*, 154 Misc. 233, 276 N.Y.S. 768 (N.Y.Sur.Ct.1935). There the wife had an unrecorded interest in jointly owned realty, and the husband contracted to sell the entire estate. The Surrogate's Court held that "... a party cannot take advantage of his own failure to record an instrument showing an interest in real property for a long period of years, permit credit to be extended to the record owner of title upon the faith of said title, and then claim that such creditors are not entitled to look to such real estate for satisfaction of their debts." *Lockwood's Estate*, 276 N.Y.S. at 772. This decision is clearly distinguishable from the one at hand, for here the deed to the IVT was recorded, and the banks had notice of it. The debtor falsely represented the realities concerning the IVT, but that does not change the fact that the deed was in the public record.

■ These cases simply do not fit the facts found to exist here. Because "[t]he doctrine of equitable estoppel should be applied cautiously and used only when grounds for its application are clearly established," this doctrine is not appropriate

in this case. *Windsor Plumbing,* 170 B.R. at 525.

This is a difficult case but, as in any other, the outcome depends on whether or not the party having the burden of proof has sustained it. The trustee argues strenuously that Vanda was an "active player" in the scheme and now "seeks to play dumb and claim to know nothing." (Trustee's Post–Trial Mem. at 15.) Such may in reality be the case, but the trustee has the burden to prove these things by a preponderance of the evidence, and his proof falls short of meeting that burden. The court may not hold for the trustee based on conjecture about what may have occurred in private conversations between Vanda and the debtor.

It is unquestioned that Vytautas Vebeliunas practiced numerous nefarious, fraudulent acts upon the banks. The conclusion must be, however, that his sins may not be visited upon his wife when there is no evidence that she was a party to them.

*Debtor's Discharge*

■■■ The trustee also seeks a judgment refusing to grant the debtor a discharge under 11 U.S.C. § 727. He has proven the elements for a judgment on this claim.

Section 727(a)(4)(A) provides for a bar of the discharge if "the debtor knowingly and fraudulently, in or in connection with the case- made a false oath or account ..." The debtor has repeatedly made statements that the banks knew he was only delivering to them a 20% contingent interest in the Lattingtown Estate. I have already found this testimony not credible. Additionally, he has testified that the trust instrument he delivered to Chase was the IVT. This statement is also false, and credible expert testimony establishes conclusively that the document attached to a transmittal letter to the bank was, in fact, the RVT. It also is plain from credible evidence that the bank's file never contained a copy of the IVT. These false oaths were made by the debtor knowingly and fraudulently.

■■■ It is hornbook law that "[a] debtor may be denied a discharge for making 'false oaths' at hearings during the case if the statements are knowingly and fraudulently false. This includes statements made by the debtor when being examined at creditors' meetings, or at other hearings during the course of the case." 6 L. KING, *Collier on Bankruptcy,* (15th ed.) ¶ 727.04[3].

Section 727(a)(4)(D) then provides that the discharge will not be granted if the debtor has "withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers relating to the debtor's property or financial condition." The record shows that the debtor has repeatedly refused to provide the trustee income tax returns for the critical years as well as other routine documents that one engaged in business, especially a public accountant, would maintain. "Often the reason for knowingly and fraudulently withholding documents would be to cover up a concealment or fraudulent transfer of assets, the failure to keep books and records, or one of the other grounds for discharge denial under section 727 ..." 6 *Collier on Bankruptcy,* (15th ed.) ¶ 727.07.

It is often stated that one of the purposes of the Bankruptcy Code is to provide a fresh start to honest debtors. Based on the evidence established at this trial, Mr. Vebeliunas simply is not within this classification.

*Exceptions to the Discharge*

■■■ If, somehow, it might be determined that the debtor is entitled to a discharge the debts he owes to the banks must be excepted from it.

Section 523(a)(2)(A) excepts from the discharge a debt for money obtained by

false pretenses, false representations or actual fraud. There is no doubt but that the debtor made false representations to the banks about the true ownership of the Lattingtown Estate and fraudulently induced them to make the loans in question. He made false statements to both banks when he told them the estate was owned by the RVT and, in the case of Citibank, that the IVT did not even exist.

Section 523(a)(2)(B) also provides an exception if the debt is obtained with a written statement, that is materially false, respecting the debtor's financial condition, on which the creditor reasonably relied, and which the debtor made with the intent to deceive. He gave both banks written financial statements that were materially false; the banks reasonably relied on them; and they were made with the intent to deceive.

For these reasons the banks' debts would be an exception to any discharge that might be granted in the future for some presently unforeseeable reason.

*The Debtor's 20% Contingent Interest in the IVT*

The trustee also raises an issue concerning the debtor's 20% contingent interest in the IVT. He seeks a declaration that this interest is property of the estate. Since, however, it is scheduled as an asset by the debtor, and clearly is estate property, which the debtor does not contest, this issue appears to be moot.

The trustee argues in his post-trial memorandum that he should be allowed to sell this interest. This result can be accomplished by a notice of sale pursuant to 11 U.S.C. § 363 and Rule 6004 of the Federal Rules of Bankruptcy Procedure.

*CONCLUSION*

Accordingly, judgment will be entered (1) in favor of defendant Vanda Vebeliunas individually and as trustee of the Irrevocable Vart Trust dismissing the complaint as

to her and; (2) in favor of the plaintiff refusing to grant the debtor a discharge under 11 U.S.C. § 727 and; (3) alternatively, excepting from any discharge the debtor may later be granted his debts to Chase Manhattan Bank and Citibank, N.A.

The automatic stay of 11 U.S.C. § 362 is modified to permit Chase Manhattan Bank and Citibank, N.A., to pursue their claims against the debtor.

Settle judgment in ten days on three days notice.